## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KRISTINE H.,

                Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

Case No. 20 C 4718

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Kristine H.[1] seeks judicial review of the final decision of the Acting Commissioner of Social Security denying her application for disability insurance benefits ("DIB"). Kristine asks the Court to reverse and remand the administrative law judge's ("ALJ") decision, and the Commissioner moves for its affirmance. For the following reasons, the Court affirms the ALJ's decision.

## BACKGROUND

Kristine initially filed for DIB on November 3, 2017, alleging disability since October 20, 2017, due to methicillin-resistant Staphylococcus aureus infection ("MRSA"), essential tremors, and arthritis in both knees. (R. 67-68). MRSA is a type of skin bacteria that is resistant to several antibiotics.[2] Prior to her alleged disability, Kristine worked as a medical assistant and phlebotomist. *Id.* at 444, 576. Her medical issues started several years prior to her alleged onset

---

[1]     Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

[2]     Centers for Disease Control and Prevention, *CDC 24/7: Saving Lives Protecting People*: *Methicillin-resistant Staphylococcus aureus General Information* (6/26/2019), https://www.cdc.gov/mrsa/community/index.html.

date.  To begin, sometime prior to 2010, Kristine felt tremors in her right hand that gradually progressed to involve both of her hands. *Id.* at 592, 619, 1780, 2043-2045.  At a neurology appointment in 2016, Kristine noted that despite the medications she was taking, her tremor symptoms were worsening. *Id.* at 596.  Specifically, she indicated that her whole body felt shaky and that her handwriting was less legible. *Id.*  Eventually, her treaters determined that she would benefit from a deep brain stimulation implantation, and in August 2016, she underwent implantation surgery. *Id.* at 622, 638.  A deep brain stimulation is commonly used to treat essential tremors.  It involves "implanting electrodes within certain areas of the brain . . .  [to] produce electrical impulses that regulate abnormal impulses," and the amount of stimulation in deep brain stimulation is controlled by a pacemaker-like device placed under the skin in the upper chest.[3] Later that year, Kristine was admitted to the hospital because her surgical wound became infected and was MRSA positive. *Id.* at 306, 691.  Nonetheless, despite her infection, Kristine still reported that the implanted device significantly helped with her tremors and that she felt great overall. *Id.* at 309, 678, 691.

Unfortunately, in early 2017, Kristine's experienced pain and drainage near her surgical incision site. *Id.* at 799, 2004.  In response, her medical providers treated her with antibiotics and performed a washout of the incision area. *Id.* at 330.  By February 2017, she was fully recovered. *Id.* at 348.  Moreover, at a consultive evaluation in April 2018 with Dr. Jyothi Gondi, Kristine reported that her tremors were better except when she turned off the stimulator's batteries at night. *Id.* at 445.  At that same visit, Kristine told Dr. Gondi that she stopped working because of her infections. *Id.* at 444.  In July 2018, at a medical office visit, Kristine requested an adjustment of

---

[3]  Mayo Clinic, *Patient Care & Health Information, Deep Brain Stimulation* (9/3/2021), https://www.mayoclinic.org/tests-procedures/deep-brain-stimulation/about/pac-20384562.

her device because her tremors were worsening and affecting her activities of daily living. *Id*. at 549. As a result, her provider adjusted her stimulator which reduced the severity of her hand tremors. *Id.* at 552. At that visit, the doctor also confirmed that Kristine's device was working well and encouraged Kristine to monitor the battery voltage and turn off the device at night. *Id.* In November 2018, she reported that the stimulator was working well, but that she had some breakthrough tremors in her left hand which she associated with an increased level of stress at that time. *Id.* at 1616.

Turning to Kristine's bouts with MRSA, she has a long history of MRSA lung and sinus infections. *Id.* at 325, 450, 576, 1181, 1566, 1575, 1669. For example, in 2015, Kristine underwent several endoscopic procedures because of a severe MRSA lung infection and pneumonia. *Id.* at 450, 1144-1181, 1534, 1558, 2038. In February 2018, after months of sinus related head pain and an invasive nasal tissue removal, her nasal swab test results were MRSA positive. *Id.* at 352, 375, 473, 479, 502, 880, 881, 875, 876. The infection in her sinuses was treated with antibiotic therapy. *Id*. at 881. Furthermore, Kristine's otolaryngologist, Dr. Standage, wrote in a March 2018 letter that Kristine was unable to keep her job because of her medical condition and headaches. *Id.* at 362. Later, at an examination in September 2018, it was noted that Kristine was doing well and that she did not have any signs or symptoms of sinusitis or infection. *Id.* at 1669-1670. However, at a 2019 emergency room visit for leg pain, Kristine mentioned experiencing some sinus pressure. *Id*. at 833.

Regarding her rheumatoid arthritis, Kristine was diagnosed when she was twenty-five years old, and she has managed the symptoms with medication since then. *Id.* at 450, 576, 1570, 1727, 1730. In a 2016 office visit, it was noted that Kristine's arthritis affected her hands, knees, and feet. *Id.* at 1570. The notes added that the arthritis medication Kristine took for many years

had to be paused and changed because of her MRSA infection. *Id.* Nonetheless, the replacement treatment she was given resulted in a 50% improvement in her swelling and pain. *Id.* At an office visit in January 2018, Kristine stated that she had significant pain in her neck, shoulders, hands, knees, and feet. *Id.* at 1723. At that visit, her doctor discussed several medications, and they decided to proceed with a new medication called methotrexate. *Id.* at 1725. Additionally, the doctor informed Kristine that she was going to need more than one arthritis medication in her regimen in the future. *Id.* At the April 2018 consultative evaluation mentioned earlier, the physician noted that: Kristine's grip strength in both hands was a 5/5; she was able to make a fist and extend her hands fully; she had no difficulty in doing fine and gross manipulation of fingers and hands bilaterally; she did not display any discomfort moving about the exam room or getting on and off the exam table; and she had full active range of motion at the hips, knees and ankles. *Id.* at 447-448. Moreover, at a follow up visit in July 2018, Kristine's doctor noted that her rheumatoid arthritis was much improved after a successful start of the methotrexate medication. *Id.* at 1729. At a January 2019 doctor's visit, Kristine stated "my arthritis has been really good" with occasional brief flares. *Id.* at 1729. Her doctor noted that her rheumatoid arthritis was "going well." *Id.* at 1730.

Finally, Kristine's knee problems originated when her legs were crushed in a motor vehicle accident in 2007. *Id.* at 445. At a May 2017 doctor's appointment, Kristine stated that her knee pain was worse with standing, walking, stairs, sitting, bending, squatting, and kneeling. *Id.* at 360. At that appointment, her doctor prescribed anti-inflammatory medication and recommended physical therapy. *Id.* At a June 2018 orthopedic visit, Kristine noted that her right knee was causing her increased pain in comparison to her left, and that her symptoms were getting progressively worse. *Id.* at 1609. As a result, she received an injection to treat the pain in her right knee. *Id.*

4

Subsequently, in September 2018, Kristine underwent a total right knee replacement. *Id.* at 833. At a post-surgery orthopedic appointment in April 2019, it was noted that her right knee was doing well. *Id.* at 1675.

On January 3, 2020, the ALJ issued a decision denying Kristine's application. *Id.* at 15-25. Following the five-step sequential analysis, the ALJ found that Kristine had not engaged in substantial gainful activity since her alleged onset date of October 20, 2017 (step 1), and that she suffered from the severe impairments of osteoarthritis of the knees, right total knee arthroplasty, essential tremors, status-post deep brain stimulator implant, chronic sinusitis, bronchiectasis, rheumatoid arthritis, mild degenerative disc disease of the lumbar spine, and mild degenerative disc disease of the cervical spine (step 2). *Id*. at 17. The ALJ determined that Kristine's MRSA infections and mild right acromioclavicular joint arthropathy/adhesive capsulitis were non-severe impairments. *Id*. at 18. Further, the ALJ determined that Kristine's impairments or combination of impairments did not meet or equal the severity of a listed impairment in 20 C.F.R. § 404, Subpt. P, App. 1 (step 3). *Id*. The ALJ next found that Kristine retained the residual functional capacity ("RFC") to perform light work except that she: can never climb ladders, ropes, or scaffolds, or kneel and crawl; cannot be exposed to cold, fumes odors, dusts and gasses, or unprotected heights and dangerous moving machinery; can occasionally climb ramps and stairs, balance, stoop, and crouch; and can frequently handle and finger. *Id.* at 19-22. At step 4, the ALJ concluded that Kristine can perform her past relevant work as a medical assistant. *Id*. at 22-23. Alternatively, given the RFC, at step 5, the ALJ found that Kristine can also perform three other jobs identified by the VE: small parts assembler, price marker, and cashier *Id*. at 24. Based on these steps 4 and 5 findings, the ALJ found that Kristine was not disabled from October 20, 2017, through the date of the decision. *Id.* at 25. The Social Security Appeals Council denied Kristine's request for review

on July 10, 2020, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-5; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 (7th Cir. 1985). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162.

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Furthermore, the Court may not "reweigh

evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the" ALJ's. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Nonetheless, where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

In support of her request for reversal and remand, Kristine argues that the ALJ made three main errors related to the assessment of Kristine's physical RFC. Kristine argues that: (1) the ALJ failed to properly accommodate impairments affecting the use of her hands; (2) the ALJ failed to account for how her pain, headaches, and fatigue may affect her ability to stay on-task sufficient to sustain full-time employment; and (3) the ALJ's finding that she could perform the standing and walking requirements of light work is unsupported by substantial evidence. Because the ALJ's decision is supported by more than a mere scintilla of evidence and a reasonable mind can accept this evidence as adequate to support the conclusion, the Court affirms.

### A.    Kristine's Ability to Use Her Hands

Kristine first argues that the ALJ did not properly accommodate her inability to effectively use her hands in the RFC. The RFC is "the most a person can do in a work setting despite the person's limitations." *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020) (citing 20 C.F.R. § 404.1545(a)(1)). In an RFC assessment, "an ALJ must include all of a claimant's limitations supported by the medical record." *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021).

In assessing Kristine's hand impairments, the ALJ found that Kristine's hand tremors "appear to have resolved, or at least are well controlled, since she underwent a deep brain stimulation implant in August 2016." (R. 19, 21). This conclusion is supported by the record. As the ALJ noted, during her April 2018 consultative examination, Kristine exhibited no tremors. *Id.* at 21, 447. Additionally, the ALJ noted that Kristine reported during the consultative examination that since her brain stimulator implant in August 2016, her tremors had been better except for

tremors at night when she turns off the batteries of the brain stimulator. *Id*. at 21, 445. Kristine asserts that the ALJ neglected to mention that subsequent to the consultative examination, her brain stimulator stopped working and her essential tremors "began to worsen and spread." Doc. [17] at 9. Notably, there is no evidence in the record indicating that her stimulator was inoperative or failing, and Kristine does not point to any. The only record evidence regarding the condition of the device is from a July 2018 doctor's visit where Kristine's doctor "made adjustments in the stimulator output that resulted in a reduction of [her] hand tremors." (R. 552). Her doctor indicated that her device was "working well" and the battery voltage was "adequate." *Id*. Kristine's doctor recommended that she turn off the stimulator at night in order to maximize battery life. *Id*. Additionally, during a November 2018 doctor's visit, Kristine reported that the battery was low on her brain stimulator. *Id*. at 1616. During the same visit, however, she confirmed that her brain stimulator continued to work well. *Id*.

In challenging the ALJ's assessment of her ability to use her hands, Kristine asserts that "[as] a result of worsening essential tremors and rheumatoid arthritis, [she] endures uncontrollable shaking and pain in her bilateral hands that prevent her from using them for even the most basic activities." Doc. [17] at 8. In support of this assertion, Kristine cites only her August 2019 testimony that she can longer handle a pen very well, she can barely write her name, it is difficult for her to work on a computer because of her shaking, the brain stimulator stopped working well in August 2018, and she often sits on her hands to hide the tremors. *Id*. at 9-10; (R. 46-49). But the ALJ specifically noted that Kristine testified to "continuing difficulties related to tremors, including problems with writing and typing." (R. at 21). The ALJ wrote: "[Kristine] described tremors in her hands that affect her ability to write or type. Per the claimant, her hand function has progressively worsened, to the extent that she is barely able to write her name." *Id*. at 20.

8

Kristine does not contest the ALJ's finding that the degree of these alleged symptoms and limitations "is not documented in the record." *Id*. at 21. Accordingly, the ALJ explicitly considered and reasonably rejected Kristine's testimony about worsening hand tremor symptoms since the April 2018 consultative examination.

Relatedly, Kristine argues that she suffers from worsening rheumatoid arthritis which causes increased pain and swelling in her already shaky hands. Doc. [17] at 10. Kristine claims that the ALJ failed to mention several pieces of evidence which support her assertion that she has been unable to keep her "rheumatoid arthritis under control, as she cannot take certain injections or medications because of MRSA." *Id*. Kristine's position is that the ALJ impermissibly "cherry picked" the medical record regarding "the toxic interplay between [her] impairments and their respective treatments, while emphasizing what she appeared to believe was an absence of symptoms." *Id*. at 11.

An ALJ must "consider all relevant medical evidence and cannot simply cherry-pick facts." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). But "an ALJ need not mention every piece of evidence." *Id*.; *Deborah M.*, 994 F.3d at 788. The record does not reveal that the ALJ cherry-picked the evidence in evaluating the severity of Kristine's hand condition. The ALJ specifically considered two of the medical records that Kristine points to in her brief. Contrary to Kristine's assertion, the ALJ did cite to and explicitly considered a February 2018 doctor's visit where her "extraordinary infection history" was discussed and the need to avoid immune suppressants was confirmed.(R. 1725); *id*. at 21 (ALJ citing Ex. 22F/1-3 and noting Kristine "had a [rheumatoid arthritis] flare in January 2018 involving primarily the shoulders, hands, and knees."). The ALJ also cited to the findings of a rheumatology examination in April 2018, which Kristine claims shows that she is often in a perpetual "catch-22" situation "plagued by disabling symptoms that

could not be treated because of the potentially dangerous adverse effects of medication." Doc. [17] at 10. The ALJ noted that by April 2018, Kristine "reported that she was doing generally well even after she had stopped taking her Methotrexate as prescribed due to a sinus infection. Her exam showed only trace swelling of the right hand and mild tenderness over the glenohumeral joint lines." (R. 21 citing 23F/344-45); *see also id.* at 2083 (4/11/2018: doctor noting Kristine "is mainly well off medication and CRP recently in range, though anti-CCP and RF strongly positive."). Further, the ALJ considered that as of September 13, 2018, Kristine had no signs or symptoms to suggest an active infection. *Id.* at 18; *see also id.* at 21 (ALJ noting that Kristine "has had recurrent MRSA infections that [] started prior to the alleged onset date, but by September 2018 she has no signs or symptoms of an active infectious process."). In addition, the ALJ noted Kristine's testimony that her last MRSA infection was in March 2019. *Id.* at 18, 50. Finally, the ALJ noted that at her January 28, 2109 rheumatology exam, Kristine reported: "My arthritis has been really good." *Id*. at 21; 2090. As the ALJ further noted, Kristine reported only occasional brief flares, denied morning stiffness or swelling most of the time, and denied significant pain. *Id*. The ALJ pointed out that her physical exam was completely normal except for diffuse mild changes, especially in the hands. *Id*. Given this record, the ALJ properly considered the medical evidence related to Kristine's rheumatoid arthritis and her inability to take her rheumatoid arthritis medication at times due to her recurrent MRSA infections.

The last piece of evidence Kristine accuses the ALJ of impermissibly failing to mention is a "notation from an infectious disease/neurosurgery consult at Mayo Clinic that an apparent absence of symptoms should be taken with a grain of salt, because she was taking immune suppressant medication." Doc. [17] at 10. The notation is from November 2016, eleven months prior to Kristine's alleged onset date, when she had a MRSA infection involving the cranial

incision from her brain stimulator implantation. (R. 306-308).  The "grain of salt" comment was made when her doctors were in the process of determining whether her MRSA infection was a superficial site infection or a more serious deep tissue device infection. *Id.* at 315.  Her doctors were hesitant to determine that her infection was only on the surface because she was on immune suppression medication for her arthritis, despite the lack of inflammatory markers present in her testing. *Id.*  Ultimately, with the confirmation of imaging, the doctors determined that her infection was superficial and did not involve the implanted device. *Id.* at 315-323.  Because this notation refers only to the accuracy of an infection test result in 2016, it is unrelated to Kristine's rheumatoid arthritis.  Thus, this evidence does not support Kristine's claim that she has been unable to control her arthritis since her October 2017 onset date because her MRSA infections prevent her from taking rheumatoid arthritis medication, and the ALJ did not err by failing to specifically mention this medical record in her decision.[4]

---

[4]     Mixed within Kristine's challenge to the ALJ's RFC as it pertains to her ability to use her hand is also the assertion that the ALJ had a predisposed belief that Kristine was exaggerating her symptoms in "direct contravention of the tenants of SSR 16-3p." Doc. [17] at 9; *see* SSR 16-3p, 2017 WL 5180304, at *11 ("our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus . . . should not be to determine whether he or she is a truthful person.").  Kristine bases her charge of bias on the fact that the ALJ noted that she worked with her hand conditions prior to her alleged onset date.  Work history is one of several factors to be considered in an ALJ's evaluation of a claimant's subjective symptom allegations. *Matthews v. Saul*, 833 F. App'x 432, 437 (7th Cir. 2020); *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016).  One reason the ALJ did provide for partially discounting Kristine's allegations regarding the severity of her hand symptoms was that she worked with her tremors and rheumatoid arthritis conditions coupled with the absence of evidence that those conditions had worsened after her alleged onset date of October 20, 2017. (R. 21).  The ALJ noted that Kristine underwent a deep brain stimulator implant for tremors in August 2016 and then returned to work as a phlebotomist. *Id.*  The ALJ found that Kristine's tremors are well controlled by the deep brain stimulation implant and there were no subsequent treatment records detailing the worsening hand tremor symptoms she described at the hearing. *Id.* at 19, 21.  Also, Kristine had lived and worked with her rheumatoid arthritis for many years as that diagnosis dates back about 20 years. *Id.* at 21. Moreover, there was no evidence of worsening of Kristine's rheumatoid arthritis condition.  As the ALJ noted, in January 2019, Kristine reported that her "arthritis has been really good" with only occasional brief flares and she denied morning stiffness or swelling most of the time and denied significant pain. *Id.*  Because an ALJ is entitled to discredit a claimant's allegations as to the severity of symptoms if a claimant worked with conditions and suffered no significant deterioration in their condition after the alleged onset date, such

Kristine also challenges the RFC's manipulative limitations. In her RFC assessment, the ALJ found that Kristine could perform "frequent handling and fingering" bilaterally. (R. 19). Kristine argues that the ALJ "failed to offer any cogent explanation for her decision to allow for frequent, rather than only occasional use of [Kristine's] hands" in assessing her RFC. Doc. [17] at 11. According to the vocational expert, no jobs would be available if Kristine were limited to occasional handling and fingering bilaterally. (R. 63).

The ALJ adequately explained why she determined that Kristine can frequently, as opposed to occasionally, handle and finger bilaterally. In particular, the ALJ supported the RFC limitation of frequent handling and fingering by relying in part on the state agency physicians' opinions. (R. 22). The state agency physicians reviewed Kristine's records and concluded that she was capable of a range of light work without any manipulative limitations. *Id.* at 74-76, 90-92. While the ALJ found the state agency physicians' opinions to be generally persuasive, she explained that the evidence received at the hearing level and Kristine's testimony regarding her tremors as well as her rheumatoid arthritis supported a limitation to frequent handling and fingering. *Id.* at 22.[5] Specifically, the ALJ discussed Kristine's allegations that her hand function has progressively worsened due to tremors in her hands that affect her ability to write or type and that she is barely able to write her name. (R. 20-21). The ALJ correctly noted, however, that there is no documentation in the medical record of her having the severe degree of hand symptoms and limitations she alleges. *Id.* at 21. The ALJ pointed to Dr. Gondi's April 2018 consultative examination during which Kristine exhibited no tremors and stated that since she had the brain

---

discounting does not indicate bias. *Lafayette v. Berryhill*, 743 F. App'x 697, 699-700; *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

[5] Kristine does not challenge the ALJ's reliance on the state agency consultants' opinions. The ALJ's manipulative limitation which was "more limiting than that of any state agency doctor [], illustrat[es] reasoned consideration given to the evidence." *Burmester*, 920 F.3d at 510.

stimulator implant, her tremors have been better except at night when she turns off the batteries of the brain stimulator. *Id*. at 21, 445-47. Dr. Gondi found that Kristine had normal grip strength, she could make a full fist and extend the hands fully, she could oppose the fingers bilaterally, and she had no difficulty in doing fine and gross manipulation of her fingers and hands bilaterally. *Id*. at 447.

The ALJ also indicated that Kristine's rheumatoid arthritis has been generally well controlled with only mild flares of short duration. (R. 19). In fact, at her January 2019 rheumatology exam, Kristine stated that her "arthritis has been really good" with only occasional brief flares. *Id*. at 21, 1729. The ALJ added that the record does not contain any medical opinion indicating that Kristine has greater manipulative limitations than those identified by the ALJ based on her tremors and rheumatoid arthritis. *Id*. at 21. Thus, the ALJ sufficiently explained her reasons, which are supported by the record, for finding that Kristine is capable of frequent versus occasional handling and fingering bilaterally. *Deborah M.*, 994 F.3d at 791 (upholding ALJ's decision not to include any manipulative limitations in the RFC despite claimant's reported difficulties using her hands due to carpal tunnel syndrome because no doctor ever found that she had manipulative limitations); *Zoch v. Saul*, 981 F.3d 597, 603 (7th Cir. 2020) (ALJ properly concluded that claimant could use her hands frequently (not occasionally) at work where the "record lacked evidence of handling limitations, except for [claimant's] testimony, which the ALJ reasonably found unreliable.").

Kristine argues that the ALJ still committed reversible error by failing to recontact her treating physicians or consult a medical expert regarding her ability to handle and finger. If there is "insufficient evidence to determine whether [the claimant is] disabled," the ALJ may recontact a medical source, request additional existing evidence, order a consultative examination, or ask

the claimant or others for more information. 20 C.F.R. § 404.1520b(b)(2). Evidence is considered to be "insufficient when it does not contain all the information need[ed] to make" a determination or decision. *Id.* An ALJ's decision to call a medical expert to testify is also discretionary. 20 C.F.R. § 404.1513a(b)(2) ("Administrative law judges may [] ask for medical evidence from expert medical sources.").

In rendering her decision, the ALJ considered the hearing testimony, Kristine's reports to her physicians that her rheumatoid arthritis was doing well, and other evidence, including the consultative examination showing lack of tremors and her report that her tremors had been better except at night when she turns off the batteries of the brain stimulator, notes from treating providers which reflect only occasional brief arthritis flares and mild changes in her hands, and the state agency reviewing physicians' opinions which found no manipulative limitations. (R. 21-22). Under these circumstances, the record contained sufficient evidence regarding Kristine's hand impairments to permit the ALJ to make a determination regarding her manipulative limitations and therefore, the ALJ properly exercised her discretion to not recontact any of the treating physicians or have a medical expert testify at the hearing. Ultimately, it was Kristine's burden, not the ALJ's, to produce evidence that supports her claims of disability. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017).

**B.      Kristine's Ability to Sustain Full-Time Work**

Kristine next argues that the ALJ's RFC determination failed to account for her need to lie down and also take naps during the day due to her pain, headaches, and chronic fatigue which is inconsistent with full-time work. The RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent

14

work schedule. SSR 96-8p. Again, "an ALJ need only include limitations [in the RFC] that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Imse v. Berryhill*, 752 Fed. App'x 358, 360-62 (7th Cir. 2018) (concluding the ALJ properly disregarded claimant's hearing testimony of needing to lie down four hours twice a week because of migraines and nap 90 minutes three times a week due to difficulty sleeping a night where "no physician, treating or otherwise, has ever indicated that there was a medical reason why she would need to lay down/nap as frequently as alleged during the day.").

Kristine testified that she needs to lie down and relax three to four times a week to ease her headaches. (R. 54). She said her headaches last from one to three hours. *Id*. at 55. Kristine also testified that she takes naps four to five times per week for 20 minutes to an hour if she had difficulty sleeping at night due to her tremors and pain in her shoulders and hands. *Id*. at 56, 57. She said she spends most of her time during the day sitting in a recliner. *Id*. at 57. The VE testified that being off task for more than ten percent of the workday would preclude full-time employment. (R. 64).

The ALJ explicitly considered Kristine's testimony that she experiences headaches three or four times per week which she associates with her tremors and treats with lying down. *Id*. at 20, 21. However, the ALJ discounted Kristine's testimony regarding the severity of her tremors and headaches as inconsistent with the medical evidence, and she does not challenge the ALJ's subjective symptom analysis as patently wrong. *Id*. at 21. As such, the ALJ properly excluded a limitation allowing time off-tasks to lie down in her RFC assessment. Moreover, the ALJ did not err in failing to mention or credit Kristine's testimony that she needs to nap most days for 20 minutes to an hour because the medical record fails to substantiate Kristine's claim. The medical record includes contradictory treatment notes indicating that Kristine denied sleeping during the

15

day in March 2018 and stated that her fatigue had largely resolved in April and July 2018. *Id.* at 929, 1729, 2084.[6]  Moreover, no physician opined that Kristine required almost daily naps. *Candice A.Z. v. Kijakazi*, 2021 WL 3187783, at *10 (N.D. Ill. July 28, 2021); *see also Green v. Saul*, 781 F. App'x 522, 528 (7th Cir. 2019) ("The RFC does not mention that Green naps for two hours every day, but this requirement is not supported by evidence other than her testimony, which the ALJ did not credit.").

Kristine relies on a March 20, 2018 letter from her otolaryngologist, Dr. Christopher Standage, which states that Kristine "was unable to keep her job" "[b]ecause of her medical condition and severe headaches." *Id.* at 362.  Dr. Standage performed Kristine's sinus surgery on July 6, 2017 and she saw him for associated follow-up appointments.  In his March 20 2018 letter, Dr. Standage wrote that Kristine "continued to have significant difficulty since her sinus surgery and has been plagued with persistent headaches and culture positive methicillin-resistant staph aureus causing significant intranasal crusting." *Id*. at 362.

Dr. Standage's statement does not show that the ALJ erred in failing to include a headache-related limitation in the RFC.   First,  none of his treatment notes provide any specific work-related functional restrictions caused by Kristine's medical condition or headaches. (R. 501, 503, 874-881, 886); *see Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (finding that a doctor's report could not be used to support specific limitations in the RFC because the evaluation notes did not include a "*functional* assessment" of the claimant's abilities, or any opinion about the limitations that claimant's impairments may have caused.); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996)

---

[6]     Kristine cites a January 2019 rheumatology examination which indicates that she complained of ongoing fatigue, but this evidence does not establish that she is unable to work full-time because of fatigue due to headaches or pain interfering with her ability to sleep. (R. 2090-91).  Rather, Dr. Benjamin Frank wrote that Kristine and her husband were "under maximal stress now" because "her husband will undergo esophagectomy next month at Mayo" for cancer and "she is uncertain if this may be behind fatigue." *Id*. at 2090.  Further, Dr. Frank did not assess any fatigue-related functional limitations.

16

("[g]iven that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best.").  Second, a physician's statement that a claimant is unable to work is an issue reserved to the Commissioner and is "neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 404.1520b(c)(3)(i); *Jill A. W. v. Kijakazi*, 2022 WL 225879, at *3-5 (N.D. Ill. Jan. 26, 2022).  As a result, the ALJ was not required to "provide any analysis of how [she] considered such evidence in [her] determination." 20 C.F.R. § 4040.1520b(c); *Jill A. W.*, 2022 WL 225879, at *5.  Third, the ALJ found generally persuasive the findings of the state agency physicians who specifically considered Dr. Standage's letter and did not find a headache-related limitation of needing to lie down. (R. 22, 70, 71, 85, 87).  And again, Kristine does not challenge the ALJ's reliance on the state agency consultants, who are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1).

Kristine next asserts that her need for excessive work absences caused by her frequent treatments would impact her ability to sustain full-time work. Doc. [17] at 13-14.  The VE testified that employers will tolerate absences of one day per month. (R. 64).  Repeated absences from work for medical reasons could disqualify a person from sustaining gainful employment. *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015) ("To miss four workdays a month would reduce one's average workweek from five to four days, which would not constitute working on a sustained basis as defined by the Commission."); *Gary B. v. Berryhill*, 2018 WL 4907495, at *4 (S.D. Ind. Oct. 10, 2018) ("Necessary visits may preclude sustaining work if they are too frequent or otherwise cannot be scheduled around a full-time competitive schedule, including if those visits regularly occur on an emergency or otherwise unpredictable basis.").  "Restrictions on a claimant's ability to sustain full-time work, due to the frequency of appointments, would fall within the analysis of

her RFC on which she maintains the burden of proof." *Bray v. Commissioner of Social Sec.*, 2014 WL 4377771, at *2 (S.D. Ohio Sept. 3, 2014); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. Aug. 20, 2018) (claimant bears the burden of providing evidence supporting "specific limitations affecting her capacity to work").

In support of her argument, Kristine cites only to her testimony that she receives treatment from a neurosurgeon at the Mayo Clinic for her tremors, she was hospitalized in July 2017 because of her MRSA, and in approximately August 2018, she had a PICC line inserted for six weeks. (R. 40, 49, 50). Kristine has not demonstrated that these treatments and visits were work prohibitive. Kristine does not state: how often she sees her neurologist at the Mayo Clinic given that she also sees a local neurologist, Dr. Benjamin Nager, for her tremors; whether those Mayo Clinic appointments could be arranged on non-work days; or how long she was hospitalized in July 2017 *Id*. at 49. Nor has she shown that the PICC line prevented her from working. Moreover, the ALJ specifically considered the frequency of Kristine's MRSA infections but correctly noted that they began prior to the alleged onset date and she had no signs or symptoms of an active infection by September 2018. *Id*. at 18, 21. Accordingly, Kristine has not met her burden to identify evidence showing that necessary appointments for treatment of her impairments would preclude full-time work. *Best v. Berryhill*, 730 Fed. Appx. 380, 382 (7th Cir. July 11, 2018) (characterizing claimant's contention that the ALJ erred in failing to account for the fact that he would have to miss work more often than employers tolerate to attend four doctors' appointments each month as "frivolous" where the claimant did not "point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours.").

**C.**     **Kristine's Ability to Stand and Walk for Six Hours in an Eight-Hour Workday**

Finally, Kristine argues that the ALJ's finding that she could perform the standing and walking requirements of light work is not supported by substantial evidence. She also contends that the ALJ did not build a logical bridge between the evidence and her finding in this regard. Kristine says that her back and lower extremity impairments leave her often unable to walk or balance and she relies on a cane. Light work requires standing or walking for a total of approximately six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983); 20 C.F.R. § 404.1567(b) (light work "requires a good deal of walking or standing.").

During her RFC analysis, the ALJ referenced Kristine's allegations and then contrasted them with the medical evidence, including examination findings and the opinion evidence. The ALJ acknowledged Kristine's testimony that: she is unable to walk without assistance on some days because her legs give out; the brain stimulator implant in August 2016 initially helped but she has developed progressive difficulties with walking; she is still receiving physical therapy after having undergone a right total knee replacement in September 2018; both knees were hurt in a car accident and she continues to have weakness in her left knee and pain with climbing stairs; she walks with the assistance of a non-prescription cane that she has used for two years; she uses the cane four days out of the week depending on her weakness and the weather; she can stand for only 5 to 10 minutes before she has to sit down because of weakness/instability in her legs; and she can walk about 10 to 12 feet with a cane and only 2 to 3 feet without a cane. *Id*. at 20. However, the ALJ found that the medical record did not support Kristine's alleged significant difficulties in standing/walking and need for a cane due to weakness, instability, and pain in her legs. *Id*. at 19, 22. The ALJ cited to numerous physical exams generally showing a normal gait, without the use of any kind of assistive device, except for a few times when her gait was noted as slightly antalgic

a couple of months prior to her September 2018 knee surgery. *See id.* at 19, 21, 22, 447, 1678, 2075, 2090; *see also id.* at 1612, 1675, 1687, 1690, 1729, 1817, 1820, 1916, 2082. Additionally, Kristine's physical therapy records show that her gait improved after her right knee arthroplasty. *Id.* at 1711, 1714. Similarly, the ALJ concluded that the medical record did not support Kristine's claim of difficulty climbing stairs. *Id.* at 22. As the ALJ noted, the record revealed that in January 2019, four months after her right knee replacement, Kristine stated she was "taking stairs normally." *Id.* at 22, 1729.

With regard to her neck and back, the ALJ referenced imaging of her cervical spine in March 2018 showing only mild degenerative changes at C7-T1 and radiological imaging of the lumbar spine in April 2019 showing only mild disc degeneration at L4-5 and L5-S1. (R. 21). The record also reflects that at the April 2018 consultative examination, Kristine exhibited full range of motion of the cervical, thoracic, and lumbosacral spine with no muscle spasm or tenderness as well as negative straight leg raising bilaterally. *Id.* at 447. Additionally, the ALJ relied on the opinions of the two state agency physicians, both of whom found that Kristine could stand or walk for six hours in an eight-hour workday. (R. 22, 74, 90). Furthermore, the ALJ observed that none of the treating, examining, or reviewing physicians concluded that Kristine was incapable of performing the standing or walking requirements of light work. *Id.* at 22; *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("[w]hen no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). And there is no opinion from any doctor that Kristine needs a cane to stand/walk. (R. 19); *Joseph M. v. Saul*, 2019 WL 6918281, at *12 (N.D. Ill. 2019). Given this record, the Court can trace the path of the ALJ's reasoning regarding Kristine's ability to walk and stand without the use of a cane and her conclusion is supported by more than a mere scintilla of evidence.

## CONCLUSION

For the reasons set forth above, Plaintiff's request for reversal and remand [17] is denied, the Acting Commissioner's motion for summary judgment [22] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated:  March 29, 2022

_____
Sunil R. Harjani
United States Magistrate Judge